# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3573

_____

Barbara Williams

*Plaintiff - Appellant*

v.

Employers Mutual Casualty Company; Capitol Indemnity Insurance Co.; Owners Insurance Company; The Collier Organization, Inc.; Employers Mutual Casualty Company

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 20, 2016
Filed: January 12, 2017

_____

Before WOLLMAN, ARNOLD, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Plaintiff-appellant Barbara Williams appeals the district court's denials of two motions to remand; grant of judgment on the pleadings in favor of the defendant-appellees Employers Mutual Casualty Company, Capitol Indemnity Insurance Co., and Owners Insurance Company; and grant of consent judgment in favor of the defendant-appellee The Collier Organization, Inc. We affirm.

# I. Background

The Collier Organization, Inc. (Collier) was the owner of Autumn Hills Mobile Home Park (Autumn Hills) in Old Monroe, Missouri. From 1998 to 2009, Collier purchased commercial general liability insurance policies from three different insurance companies: Employers Mutual Casualty Company (Employers), Capitol Indemnity Insurance Company (Capitol), and Owners Insurance Company (Owners) (collectively, the Insurers). Employers issued three year-long policies, covering the period from March 13, 1999, to March 13, 2002. Capitol issued two year-long policies, covering the period from April 1, 2003, to April 1, 2005. Owners issued four year-long policies, covering the period from April 1, 2005, to April 1, 2009. Each policy provided that the relevant insurance company had a duty to defend and indemnify Collier for "bodily injury and property damage" resulting from "occurrences."

On March 5, 2008, Michelle Pratt brought a class-action lawsuit (Original Action) in Lincoln County, Missouri Circuit Court on behalf of the residents of Autumn Hills against Collier and two other entities that are not parties in this case. Williams was later substituted as class representative. The state court certified a class of Autumn Hills residents.

The complaint alleged that from 1999 to 2008, the two wells that supplied Autumn Hills with drinking water contained illegal levels of Radium 226, combined Radium 226 and Radium 228, gross alpha particle activity, and coliform bacteria. According to the complaint, Collier was aware the water supply was contaminated, and failed to correct the issue. Further, the complaint alleged that Collier failed to inform Autumn Hills residents of the contamination, as required by Missouri law. As a result, the complaint stated, class members "suffered injury and damages including,

but not limited to, the payment of monies to the Defendants for rent, water and sewer systems; the diminution in value of . . . property; costs of relocation; purchasing alternative sources of water; mental anguish and other damages." The complaint additionally alleged that Collier promised to build a picnic area, basketball court, and other amenities at Autumn Hills, and never did. The complaint asserted claims for fraud, violation of the Missouri Merchandising Practice Act, breach of the implied warranty of habitability, negligence, negligence per se, and breach of contract.

Collier informed each of the Insurers of the complaint, and demanded indemnity and defense. Each of the Insurers declined. Thereafter, Williams entered into an agreement with Collier, which provided that Collier would assign the rights to its insurance proceeds to Williams, as class representative. In exchange, Williams agreed that if the class obtained judgment against Collier, the class' recovery would be limited to those insurance proceeds. This type of agreement is specifically authorized by Missouri law. See Mo. Rev. Stat. § 537.065.

The state court held an evidentiary hearing to determine liability. At the hearing, Williams dismissed all claims except for the negligence claim, and orally amended the pleadings to add a claim for trespass. Shortly after the hearing, the state court entered findings of fact, conclusions of law, and a judgment in favor of the class. Specifically, the state court concluded that Collier "pump[ed] water with levels of combined Radium 226 and Radium 228 and Gross Alpha Particle Activity levels that exceeded the established maximums." The state court also concluded that the class suffered bodily injury and property damage as a result of the Radium and alpha particle activity in the water. On August 28, 2013, after a separate hearing on damages, the state court awarded the plaintiffs $70,085,000 for medical monitoring, and $11,952,000 for the loss in value to their homes.

On October 18, 2013, Williams filed an equitable garnishment action in state court against the Insurers and Collier pursuant to Missouri Revised Statute § 379.200, which provides that if a plaintiff's judgment against a defendant is not satisfied within thirty days, "the judgment creditor may proceed in equity against the defendant and the insurance company to reach and apply the insurance money to the satisfaction of the judgment." The complaint stated that Williams was bringing the equitable garnishment action "as class representative, by and through class counsel."

The Insurers removed the case to the United States District Court for the Eastern District of Missouri, asserting jurisdiction under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d). Williams moved to remand, arguing that the equitable garnishment action was not a "class action" as defined by § 1332(d)(1)(B). The district court[1] denied the motion on April 8, 2014, concluding that although the garnishment action was not brought under a statute specifically authorizing class action suits, it was a class action under CAFA because Williams filed it on behalf of a class. Later, after the case was reassigned to a different district court judge,[2] Williams filed a renewed motion to remand, which the district court denied on July 28, 2015.

The Insurers each moved for judgment on the pleadings. Each argued that it was not obligated to defend or indemnify Collier, because none of the claims asserted in the Original Action were covered by the policies issued to Collier. The district court granted judgment on the pleadings in favor of the Insurers on March 2, 2015. First, it concluded as a matter of law that the allegations that Autumn Hills' drinking

---

[1]The Honorable Judge Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri.

[2]The Honorable Judge Ronnie L. White, United States District Judge for the Eastern District of Missouri.

-4-

water supply contained illegal levels of Radium, alpha particle activity, and coliform bacteria fell within a pollution exclusion contained in each policy. Second, it concluded as a matter of law that the allegations that Collier failed to build promised amenities at Autumn Hills were not covered by the policies because the policies did not provide coverage for breach of contract.

At that point, Collier still had not been served with process. On March 3, 2015, the district court ordered Williams to show cause as to why Collier should not be dismissed without prejudice pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. Williams responded, explaining that if she filed an appeal before obtaining service on Collier, the Eighth Circuit might deem the appeal premature, and remand it to the district court. Williams then served Collier. Collier failed to appear, and Williams moved for a default judgment, which was granted on August 25, 2015. On October 8, 2015, the court set aside the default judgment against Collier and allowed Collier to file a motion to dismiss, which it then denied.

On October 21, 2015, the district court entered a "Consent Judgment" in favor of Collier. The order stated, "The only remaining defendant in this equitable garnishment action is Collier. Collier is a nominal but necessary party under Missouri's equitable garnishment statute. Mo. Rev. Stat. § 379.200. Based on its prior ruling, the Court finds no relief can be obtained against Collier under Mo. Rev. Stat. § 379.200 and the Court must enter judgment in favor of Collier." Counsel for Collier and Williams both signed the judgment. Williams filed a notice of appeal on November 2, 2015.

## II. Discussion

Williams appeals the district court's denials of her two motions to remand, as well as the district court's grant of judgment on the pleadings in favor of the Insurers,

-5-

and grant of consent judgment in favor of Collier. Before we reach Williams' arguments, we must consider the Insurers' contention that we lack jurisdiction over this appeal.

**A. Jurisdiction over appeal**

As an initial matter, the Insurers contend that we lack jurisdiction to consider this appeal. They argue that a consent judgment is not appealable, that the March 2, 2015, judgment on the pleadings was a final judgment, and that the district court erred in granting Williams an extension of time to file a notice of appeal to the judgment on the pleadings. The Insurers previously moved to dismiss this appeal on the same grounds. An administrative panel denied that motion without comment. This court has an ongoing obligation to consider its own jurisdiction. United States v. Stanko, 762 F.3d 826, 828 n.3 (8th Cir. 2014) (per curiam). However, "an administrative panel's denial of a motion to dismiss for lack of jurisdiction typically 'is the law of the case, ordinarily to be adhered to in the absence of clear error or manifest injustice.'" Id. (quoting McCuen v. Am. Cas. Co., 946 F.2d 1401, 1403 (8th Cir. 1991)).

First, the Insurers argue that a consent judgment like the one the district court entered in favor of Collier is not appealable. They further argue that all of the district court's orders prior to the consent judgment merge into the consent judgment, and, therefore, are likewise not appealable. We have previously held that appellate jurisdiction exists over all "final decisions," regardless of what form they take. See Great Rivers Coop. v. Farmland Indus., Inc., 198 F.3d 685, 689 (8th Cir. 1999) (holding that there is appellate jurisdiction over a voluntary dismissal without prejudice, but noting that an appellate court has discretion to reverse a district court's grant of voluntary dismissal, or to deem an ambiguous voluntary dismissal to be with prejudice). Here, the consent judgment was a final decision because it

unconditionally disposed of the last of Williams' unresolved claims.[3]  Thus, we have jurisdiction over the appeal of the consent judgment.

However, there is a non-jurisdictional limitation on appeals from consent judgments:  Generally, where a party consents to a judgment, it has waived its right to appeal the claims disposed of by that judgment.  See Scanlon v. M.V. SUPER SERVANT 3, 429 F.3d 6, 8 (1st Cir. 2005) (collecting cases); Walling v. Miller, 138 F.2d 629, 631 (8th Cir. 1943).  But several courts have recognized an exception to this general rule, holding that a party has not waived its right to appeal a consent judgment when the consent judgment followed a ruling that was, as a practical matter, case-dispositive.  Those courts reason that in such circumstances, the party adverse to the dispositive ruling has consented to putting the ruling in its final form, not to the substance of the judgment.  See Taylor Brands, LLC v. GB II Corp., 627 F.3d 874, 878 (Fed. Cir. 2010) (stipulated judgment was appealable where it followed a partial summary judgment order that was practically case-dispositive); OFS Fitel, LLC v. Epstein, Becker & Green, P.C., 549 F.3d 1344, 1357 (11th Cir. 2008) (consented-to judgment of dismissal was appealable where it followed the district court's exclusion of the appellant's expert witness, and the appellant's legal malpractice claims inherently required the testimony of an expert witness); The Ansaldo San Giorgio I, 73 F.2d 40, 41 (2d Cir. 1934) (consent decree was appealable where it "merely carried into effect the court's previous decision on a litigated issue"); cf. United States v. Procter & Gamble Co., 356 U.S. 677, 679–80 (1958) (judgment of dismissal was appealable where the government refused to obey a district court order to produce grand jury transcripts, and the government asked the district court to order dismissal

---

[3]Of course, not all consent judgments are necessarily final judgments.  See Ruppert v. Principal Life Ins. Co., 705 F.3d 839, 842 (8th Cir. 2013) (holding that a consent judgment was not final where it incorporated a settlement agreement that permitted the appellant to reinstate his settled claims if he was successful in appealing an earlier adverse ruling).

as a sanction—rather than civil contempt or some other sanction—in order to expedite review).

Here, the record shows that Williams consented to entry of judgment because Collier was a nominal defendant, and, as a result, the district court's grant of judgment on the pleadings in favor of the Insurers effectively disposed of Williams' entire case. Under these circumstances, we conclude that Williams' consent to entry of judgment against her represented consent to the form, rather than the substance, of the judgment. Accordingly, Williams has not waived her right to appeal the consent judgment.

Next, the Insurers argue that we have no jurisdiction over the appeal of the March 2, 2015, judgment on the pleadings entered in favor of the Insurers. According to the Insurers, the judgment on the pleadings was a final, appealable order, and the district court abused its discretion in granting Williams an extension of time to file its notice of appeal of the judgment. Thus, the Insurers argue, the notice of appeal of the judgment on the pleadings was filed out of time, depriving this court of jurisdiction.

A judgment that disposes of claims against some, but not all, defendants is generally not considered to be final and appealable. Fed. R. Civ. P. 54(b). However, it is not "necessary for the district court to have disposed of [an unserved party] to make the judgment entered . . . final and appealable" because an unserved party is not a "party" under the meaning of Federal Rule of Civil Procedure 54(b). Young v. Mt. Hawley Ins. Co, 864 F.2d 81, 83 (8th Cir. 1988) (per curiam). Thus, the Insurers argue, the judgment on the pleadings was a final, appealable order even though Collier had not yet been served when the judgment on the pleadings was entered.

But "[a] district court decision is not final, and thus not appealable, unless there is some clear and unequivocal manifestation by the trial court of its belief that the

decision made, so far as [the court] is concerned, is the end of the case." Waterson v. Hall, 515 F.3d 852, 855 (8th Cir. 2008) (second alteration in original) (quoting Hunt v. Hopkins, 266 F.3d 934, 936 (8th Cir. 2001)). Here, there was no clear and unequivocal manifestation by the district court that the judgment on the pleadings disposed of the case. Rather, the day after entering the judgment on the pleadings, the district court ordered Williams to show cause as to why Collier should not be dismissed. Cf. Hunt, 266 F.3d at 936 (explaining that the "presumption of finality" that attaches to a dismissal order "erodes . . . when the district court clearly manifests an intention to permit the plaintiff's action to continue once new pleadings are filed"). The district court continued to exercise jurisdiction over the case until the entry of the October 21, 2015 consent judgment against Collier. Thus, in the district court's view, the judgment on the pleadings was not the end of the case. As such, we conclude that the judgment on the pleadings was not a final order, and, therefore, Williams did not file her notice of appeal out of time.

## B. Order denying remand

Williams appeals the district court's denials of her two motions to remand the present action to state court. She argues that the district court did not have jurisdiction over the present action because it is not a "class action" as defined by CAFA. We review the district court's interpretation of CAFA de novo. Brown v. Mortg. Elec. Registration Sys., Inc., 738 F.3d 926, 931 (8th Cir. 2013).

Section 1332(d)(2) of Title 28 of the United States Code states that federal district courts have jurisdiction over any "civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action" where "any member of a class of plaintiffs is a citizen of a State different from any defendant." Section 1332(d)(1) defines "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State

statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."

In the motions to remand, Williams argued that the present action is not a class action because it was not "filed under" Rule 23 or a state-law analogue. The parties do not dispute that the complaint in the Original Action referred to Missouri Rule of Civil Procedure 52.08, or that Rule 52.08 is analogous to Rule 23. But, Williams points out, the complaint in the present action does not refer to Rule 52.08; rather, it refers only to Missouri Revised Statute § 379.200—the equitable garnishment statute that allows a plaintiff to satisfy a judgment against a tortfeasor's insurer.

The district court concluded that, although labeled otherwise, the present action is a class action because it is a class action in substance. In the district court's view, the fact that Williams brought the present action in her capacity as class representative "necessarily implies application of procedural rules that certified the class (and authorized plaintiff to act on behalf of that class) in the first place." In reaching this conclusion, the district court relied on Addison Automatics, Inc. v. Hartford Casualty Insurance Co., 731 F.3d 740 (7th Cir. 2013).

In Addison, a plaintiff represented a class in a state-court class action. 731 F.3d at 741. The defendant agreed to entry of judgment against it, and the class agreed to execute the judgment against the defendant's insurer. Id. The class representative filed a separate lawsuit against the insurer in state court, but purported to bring the action in an individual, rather than representative, capacity. Id. at 742. The insurer removed the case to federal court, asserting jurisdiction under CAFA. Id. The district court granted the class representative's motion to remand to state court, finding that the action was not a class action. Id. The Seventh Circuit reversed, concluding that although the case was brought as an individual suit, "[b]y pursuing the rights assigned to it as class representative in the state court class action, [the plaintiff] is necessarily continuing that class action." Id. at 743.

Williams argues that <u>Addison</u> and the district court incorrectly interpreted CAFA when they concluded it was appropriate to look to the substance of a lawsuit to determine whether it is a class action. In her view, under the plain language of CAFA, an action is "filed under" Rule 23 or a state-law analogue only where the complaint expressly invokes such a rule, which the complaint in the present action does not do. Further, Williams contends that the complaint seeks no relief under class rules, and requires no resolution of class-related issues. Thus, Williams argues, this action is not a class action.

In support of her interpretation of CAFA, Williams cites cases from other circuits that have found no CAFA jurisdiction where a plaintiff brings a lawsuit in a representative capacity and cites a state statute or rule that is not analogous to Rule 23. For example, the Third Circuit held that there was no CAFA jurisdiction over a case brought under Rule 2152 of the Pennsylvania Rules of Civil Procedure, which allows members of an unincorporated association to sue on behalf of the association. <u>Erie Ins. Exch. v. Erie Indem. Co.</u>, 722 F.3d 154, 158–59 (3d Cir. 2013). The court concluded that Rule 2152 was not sufficiently analogous to Rule 23 to justify CAFA jurisdiction, because Rule 2152 "contains none of the defining characteristics of Rule 23," such as class certification mechanisms, requirements of numerosity or commonality, or requirements that absent class members be notified of the substance of the lawsuit. <u>Id.</u> Other courts have applied the same reasoning to other state statutes that allow a plaintiff to sue in a representative capacity, but are otherwise dissimilar to Rule 23. <u>See, e.g.</u>, <u>Baumann v. Chase Inv. Servs. Corp.</u>, 747 F.3d 1117, 1122–23 (9th Cir. 2014) (finding that California's Private Attorneys General Act is not sufficiently similar to Rule 23); <u>Purdue Pharma L.P. v. Kentucky</u>,704 F.3d 208, 216 (2d Cir. 2013) (finding that a *parens patriae* lawsuit brought by a state attorney general is not similar to Rule 23); <u>West Virginia ex rel. McGraw v. CVS Pharm., Inc.</u>, 646 F.3d 169, 176 (4th Cir. 2011) (same).

Williams argues that, like the plaintiffs in the cases she cites, she is entitled to bring suit under whatever law she chooses. And, she argues, like those plaintiffs, she has chosen to bring suit pursuant to a state statute that is not analogous to Rule 23—Missouri's equitable garnishment statute. However, the circumstances of this case distinguish it from the line of cases Williams relies on. In each of those cases, the plaintiff cited some rule or statute that purportedly allowed the plaintiff to proceed as the representative of a group of people, but that otherwise was not sufficiently similar to Rule 23 for purposes of CAFA. Here, the equitable garnishment statute includes no provision authorizing a plaintiff to bring suit on behalf of others. Rather, it is clear from the pleadings that Williams can bring this case only because of her status as the representative of the class certified under Rule 52.08, an undisputed analogue of Rule 23. See Sondel v. Nw. Airlines, Inc., 56 F.3d 934, 939 (8th Cir. 1995) (holding that class representatives retain their fiduciary duties to the class even in separate proceedings).

Williams suggests that this fact is irrelevant, because the present case does not involve class-related questions. She notes that the complaint in the present action does not seek class certification, and asserts that there are no "notice, opt-out, or court approval issues involved" in the present case. And, she points out, the district court did not actually resolve any class-related questions in its disposition of the case. Thus, she argues, even though she is proceeding on behalf of a class, that circumstance has no bearing on this case. We disagree. Even if recertification is unnecessary,[4] the present action implicates other class-related issues. For example,

_____

[4]The court declines to address whether Williams is correct that the class would not be required to be certified in the present action. See Zimmermann v. Epstein Becker & Green, P.C., 657 F.3d 80, 85 (1st Cir. 2011) (holding that although the plaintiff class was certified in a previous action, it was required to be certified anew when it brought claims against new defendants whose liability would have to be separately proven). But see Addison, 731 F.3d at 743 ("[The plaintiff] urges us to consider the present suit in a vacuum, arguing that there is no need to 'reconstitute'

-12-

if Williams chose to dismiss or settle this case in state court, the court would have been obligated to direct Williams to give notice to the members of the class under Rule 52.08(e). Again, Williams filed the complaint not in her individual capacity, but as class representative. And the fact that the district court did not ultimately resolve any class-related issues is irrelevant; a federal court's jurisdiction under CAFA is "measured at the time of removal," and does not depend on the ultimate outcome of the case. See Grawitch v. Charter Commc'ns, Inc., 750 F.3d 956, 959 (8th Cir. 2014).

In other words, although the complaint omits reference to Rule 52.08, it is clear from the face of the complaint that Rule 52.08 is the precise rule under which Williams proceeds in her effort to enforce the judgment obtained for the benefit of the class. Thus, because Rule 52.08 is undisputedly analogous to Rule 23, we conclude that this action was "filed under" a state-law analogue to Rule 23, and is a class action for purposes of CAFA jurisdiction. To hold otherwise would prioritize a complaint's use of magic words over its factual allegations. See Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). If we interpreted "any civil action filed under Rule 23" or a state-law analogue to refer only to cases that specifically mention Rule 23 or a state-law analogue, as Williams proposes, a plaintiff could avoid federal jurisdiction for a lawsuit that resembles a class action in all respects simply by omitting from the complaint the name of the rule or statute under which she proceeds.

Additionally, we note that our conclusion is in line with the legislative intent behind CAFA. In enacting CAFA, Congress expressed concern about lawyers who "'game' the procedural rules and keep nationwide or multi-state class actions in state courts whose judges have reputations for readily certifying classes and approving

---

the class here. On the contrary, the class has been and remains certified pursuant to Illinois law . . . .").

-13-

settlements without regard to class member interests." S. Rep. No. 109-14, at 4 (2005). Thus, Congress emphasized that "class action" should be "interpreted liberally." <u>Id.</u> at 35. Congress explained, "[CAFA's] application should not be confined solely to lawsuits that are labeled 'class actions' by the named plaintiff or the state rulemaking authority. Generally speaking, lawsuits that resemble a purported class action should be considered class actions for the purpose of applying these provisions." Id. We conclude that allowing class-action plaintiffs to avoid federal jurisdiction simply by omitting explicit reference to the class-action rule they intend to proceed under would promote the kind of procedural gaming CAFA was enacted to prevent.

Finally, Williams argues that another provision of CAFA prohibits removal of an action to enforce a judgment on behalf of a previously certified class. Section 1332(d)(8) states, "[Section 1332(d)] shall apply to any class action before or after the entry of a class certification order by the court with respect to that action." In Williams' view, the phrase "with respect to that action" establishes that CAFA jurisdiction exists only over class actions in which a class has been or will be certified. But this interpretation is at odds with the plain language of § 1332(d)(8); it refers to "a" class certification order, not "the" class certification order. This phrasing may imply "an expectation that a class will or at least may be certified eventually," but it does not limit federal jurisdiction to cases in which a class certification order is actually issued. Cunningham Charter Corp. v. Learjet, Inc., 592 F.3d 805, 806 (7th Cir. 2010). Furthermore, to hold that § 1332(d)(8) limits jurisdiction in that way would be at odds with our decision in Buetow v. A.L.S. Enterprises, Inc., in which we noted that federal jurisdiction over a class action continues even after a district court has denied class certification. 650 F.3d 1178, 1182 n.2 (8th Cir. 2011) (citing Learjet, Inc., 592 F.3d at 806)). Accordingly, it is apparent that § 1332(d)(8) merely clarifies *when* it is permissible to remove a case, and does not impose prerequisites for jurisdiction beyond those articulated in § 1332(d)(2).

In sum, because Williams brought this action on behalf of a class previously certified under a state-law analogue to Rule 23, the action was necessarily "filed under" Rule 23 or a state-law analogue, even though the complaint omits explicit reference to such a rule. The district court therefore had jurisdiction over the present matter.

## C. Judgment on the pleadings

Next, Williams appeals the district court's grant of judgment on the pleadings to the Insurers, arguing that the district court erred in concluding that the Insurers had no duty to defend or indemnify Collier in the Original Action. We review de novo the grant of a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015).

### 1. Duty to defend

The district court compared the complaint in the Original Action with the insurance policies, and concluded that the Insurers had no duty to defend Collier. First, the district court concluded that the allegations that Autumn Hills' water contained illegal levels of Radium, alpha particle activity, and coliform bacteria did not give rise to a claim potentially within the policies' coverage, because each policy contained a provision excluding coverage for bodily injury or property damage caused by pollutants. Second, the district court concluded that the allegations that Collier failed to build promised amenities did not give rise to claims potentially within the policies' coverage because the policies did not cover breaches of contract. Williams contests both of these conclusions. The parties agree that Missouri law applies to the interpretation of the insurance policies.

Under Missouri law, if an insurer unjustifiably refuses to defend a claim because it is outside the policy, the insurer will be "liable to the insured for all

-15-

resultant damages from that breach of contract." Schmitz v. Great Am. Assur. Co., 337 S.W.3d 700, 710 (Mo. banc 2011) (quoting Whitehead v. Lakeside Hosp. Ass'n, 844 S.W.2d 475, 481 (Mo. Ct. App. 1992)).  But "[w]here the claim is actually outside the policy coverage, the refusal of the insurer to defend is a justified refusal, the insurer is not guilty of a breach of contract and incurs no legal liability by its action." Whitehead, 844 S.W.2d at 481.

An insurer's duty to defend "arises whenever there is a potential or possible liability to pay based on the facts at the outset of the case and is not dependant on the probable liability to pay based on the facts ascertained through trial." McCormack Baron Mgmt. Servs., Inc. v. Am. Guarantee & Liab. Ins. Co., 989 S.W.2d 168, 170 (Mo. banc 1999) (quoting 13 John A. Appleman & Jean Appelman, Insurance Law and Practice § 4684 (rev. vol. 1976)).  To determine whether an insurer had a duty to defend, courts must "compar[e] the language of the insurance policy with the allegations in the complaint." Id.  If the complaint "alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend." Id. at 170–71.

In construing insurance policies, Missouri courts apply "the meaning which would be attached by an ordinary person of average understanding if purchasing insurance, and resolves ambiguities in favor of the insured." Burns v. Smith, 303 S.W.3d 505, 509 (Mo. banc 2010) (quoting Seeck v. Geico Gen. Ins. Co., 212 S.W.3d 129, 132 (Mo. banc 2007)).  The burden of proving an insurance exclusion lies with the insurer, and insurance exclusions are strictly construed against the insurer. Id. at 510.

### a. Pollution exclusion

Williams first contends that the pollution exclusion contained in each insurance policy does not, as a matter of law, bar coverage for the claims that Autumn Hills'

water had illegal levels of Radium, alpha particle activity, and coliform bacteria. Each of the policies Employers issued to Collier provided that the policy would not cover "'[b]odily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' . . . [a]t or from any premises, site or location which is or was at any time owned or occupied by, rented or loaned to, any insured." Each of the policies issued by Owners contained an identical provision. Each of the policies issued by Capitol provided that the policy would not cover "'[b]odily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." All of the policies contained a provision stating, "'Pollutants' mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."[5]

The district court determined as a matter of law that the pollution exclusions applied to Williams' claims that Autumn Hills' water contained illegal levels of Radium, alpha particle activity, and coliform bacteria. First, the district court noted that alpha particles are emitted by Radium during the decay process, that alpha particles can travel only very short distances away from Radium, and that Radium is indisputably a solid. In so concluding, the district court cited an Environmental Protection Agency (EPA) fact sheet. The district court further determined that Radium and alpha particles are contaminants under the plain meaning of that word. Next, the district court concluded that coliform bacteria are also solid, liquid, gaseous, or thermal, and that they are contaminants under the plain meaning of the

_____

[5]The policy issued by Employers effective March 13, 1999, and the policy issued by Owners effective April 1, 2005, both contain slight variations from the quoted language. Each reads, "Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

-17-

word.  Thus, the district court explained, "There can be no dispute that the contaminants at issue here are pollutants under the policy."  Williams contends that the district court erred in reaching this conclusion as a matter of law.

### i. Alpha particle activity and Radium

As an initial matter, Williams argues that the district court erred in relying on an EPA fact sheet to determine that Radium is a solid that emits alpha particles. Williams contends that the district court did not take judicial notice of the EPA fact sheet, and that, even if the district court had done so, such judicial notice would have been inappropriate.

On a motion for judgment on the pleadings, matters outside the pleadings generally cannot be considered without converting the motion to one for summary judgment.  Fed. R. Civ. P. 12(d).  However, courts may "consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;' without converting the motion into one for summary judgment."  Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 931 n.3 (8th Cir. 2012) (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)).  Under Federal Rule of Evidence 201(b), a court may take judicial notice of a "fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." This can include well-established scientific theories and principles.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 n.11 (1993).  "We review a district court's decision to take judicial notice for abuse of discretion."  Am. Prairie Constr. Co. v. Hoich, 560 F.3d 780, 796 (8th Cir. 2009).

Here, it is clear that the district court took judicial notice of the fact that Radium is a solid that emits alpha particles.[6]  Although the court did not use the specific phrase "judicial notice," the district court implicitly acknowledged the limitations on its ability to consider matters outside the pleadings.  It used phrases like "[t]here can be no dispute" and "Radium is indisputably a solid which emits alpha particles"—language intended to address Rule 201's requirement that only facts "not subject to reasonable dispute" can be judicially noticed.

Furthermore, the district court did not abuse its discretion in taking judicial notice of the fact that Radium is a solid that emits alpha particles.  Williams contends that judicial notice was inappropriate because there were disputed matters at hand. We disagree.  Although Williams disputes that alpha particles are solid, liquid, gaseous, or thermal, she does not meaningfully dispute that Radium is a solid, or that alpha particles are emitted by Radium.  And there can be no reasonable dispute on those points, upon which numerous widely available sources demonstrate broad consensus.  E.g., Radium, Merriam-Webster's Collegiate Dictionary 1026 (11th ed. 2012) (defining "radium" as a "metallic element that . . . occurs in combination in minute quantities in minerals (as pitchblende or carnotite), [and] emits alpha particles"); Radium, Britannica Academic, http://academic.eb.com/levels/collegiate/article/62430 (log-in required) (last visited Dec. 30, 2016) (explaining that Radium is a "silvery white metal" that releases alpha particles).

[6]Williams' argument focuses on whether the district court properly took judicial notice of the EPA fact sheet itself.  But Rule 201 permits courts to take judicial notice only of facts.  See Fed. R. Evid. 201; Crawford v. Countrywide Home Loans, Inc., 647 F.3d 642, 649–50 (7th Cir. 2011) (affirming the district court's refusal to take judicial notice of various documents where the offering party failed to delineate the particular facts to be noticed based on the documents).  Thus, the proper inquiry is whether the district court properly took judicial notice of the fact that Radium is a solid that emits alpha particles, not whether the district court properly took judicial notice of the *source* of that fact—the EPA fact sheet.

Next, Williams argues that the district court erred in concluding that the pollution exclusion applies because alpha particles are not, as a matter of law, "pollutants" under the policy. Specifically, Williams argues that there is a question of fact as to whether alpha particles are solid, liquid, gaseous, or thermal, and that the terms "irritants" and "contaminants" are ambiguous and arguably do not apply to alpha particles. But Williams frames the issue too narrowly. The policies exclude coverage for bodily injury or property damage either "arising out of" the dispersal of pollutants, or which "would not have occurred in whole or part but for" the dispersal of pollutants. It is not disputed the alpha particle activity in Autumn Hills' water supply resulted directly from the presence of Radium in the water—the alpha particles were emitted by the Radium. Thus, to the extent alpha particles caused the alleged bodily injury or property damage, that damage is excluded from the policy if the term "pollutants," as defined by the policies, includes *either* alpha particles or Radium. We conclude that, regardless of whether alpha particles are pollutants, Radium is a pollutant under the policies.

As explained above, Radium is indisputably a solid at room temperature. Thus, we turn to the question of whether Radium is, as a matter of law, an irritant or contaminant. In Williams' view, the terms "irritant" and "contaminant" are ambiguous, because virtually any substance can be an irritant or contaminant in some contexts, and alpha particle activity is naturally occurring and not always harmful. Thus, Williams argues, we are required to construe these terms against the Insurers and decline to apply the pollution exclusion.

Where a particular term is not defined in an insurance policy, Missouri courts look to the "ordinary meaning of the word, as set forth in the dictionary." Schmitz, 337 S.W.3d at 708. The dictionary definition of "contaminant" is "something that contaminates." Merriam-Webster's Collegiate Dictionary 269 (11th ed. 2012). To "contaminate," in turn, is defined as "to soil, stain, corrupt, or infect by contact or

association," or "to make unfit for use by the introduction of unwholesome or undesirable elements." Id.

Missouri courts have held that the term "contaminant" is ambiguous in some circumstances, and unambiguous in others, depending on the purported pollutant and the circumstances of its dispersal. The relevant question is not whether the term "contaminant" "might be found ambiguous regarding some other substance in a different factual setting," but whether the term is ambiguous as applied to the particular substance in the factual setting at issue. Cas. Indem. Exch. v. City of Sparta, 997 S.W.2d 545, 551 (Mo. Ct. App. 1999); see also United Fire & Cas. Co. v. Titan Contractors Serv., Inc., 751 F.3d 880, 886 n.3 (8th Cir. 2014) (explaining that under Missouri law, the term "pollutant" in an insurance policy provision "may be ambiguous with respect to the factual situation presented by one claim but unambiguous as to another"). For example, in Cincinnati Insurance Company v. German St. Vincent Orphan Association, Inc., a Missouri Court of Appeals held that although there are some circumstances in which it would be ambiguous whether a given substance is a contaminant, the word unambiguously applies to asbestos that was excavated and pulverized into thick clouds of dust that filled a building. 54 S.W.3d 661, 666 (Mo. Ct. App. 2001).

We conclude that in the factual context of this case, Radium is unambiguously a contaminant. Williams may be correct that there are circumstances in which Radium and its emissions might not be harmful. But here, the complaint alleges that illegal levels of Radium were present in the water supply, creating a serious risk to the health of Autumn Hills residents, which required them to relocate or purchase alternative sources of water. Additionally, the complaint in the Original Action itself refers to Radium and its emissions as "radiological contaminants" throughout, and alleges that the levels of Radium in the water exceeded the "Maximum Contaminant Level" set forth by Missouri's Department of Natural Resources. Thus, in the context of the allegations set forth in the complaint in the Original Action, Radium

-21-

is unambiguously a contaminant under the ordinary meaning of the word; it both "corrupted" the water "by contact," and made it "unfit for use." As such, the pollution exclusion in each policy bars coverage for bodily injury or property damage alleged to have resulted from the presence of Radium or alpha particles in Autumn Hills' water supply.

### ii. Coliform bacteria

Williams next argues that the district court erred in concluding as a matter of law that coliform bacteria are pollutants. As with the Radium and alpha particles, Williams argues first that there is a genuine dispute of fact as to whether coliform bacteria are solid, liquid, gaseous, or thermal, and second that coliform bacteria are not unambiguously contaminants.

First, in Williams' view, to be a pollutant as defined by the policies, a substance must exist in a purely solid, liquid, gaseous, or thermal form. Williams points out that coliform bacteria are living organisms, and do not fit into any one of those categories. But read as a whole, the definition of "pollutants" in each policy encompasses substances that contain a *combination* of solid, liquid, gaseous, and thermal elements. The provision lists examples of pollutants including, among other things, "smoke" and "waste." We take judicial notice of the fact that smoke is a mixture of solid and liquid particles suspended in gas. <u>See</u> Merriam-Webster's Collegiate Dictionary 1178 (11th ed. 2012) (defining smoke as "the gaseous products of burning materials . . . made visible by the presence of small particles of carbon"); Bukowski, Richard W., AccessScience (2014), <u>Smoke</u>, https://doi.org/10.1036/1097-8542.629200 (log-in required) (stating that smoke is a "dispersion of small, solid particles and liquid droplets suspended in a gaseous medium"). Similarly, waste can be a combination of solid and liquid materials, like sewage sludge. Like other living organisms, coliform bacteria is made up of a

combination of solid, liquid, gaseous, and thermal elements. Thus, it is a pollutant under the plain language of the policy.

Next, Williams argues that coliform bacteria are not contaminants, arguing that the term is ambiguous, and that it arguably does not apply to coliform bacteria, which occur naturally and are not necessarily harmful in every context. But our reasons for concluding that Radium is a contaminant apply with equal force to coliform bacteria: The coliform bacteria are alleged to have posed a health risk to Autumn Hills residents, and to have exceeded "contamination levels" set by Missouri's Department of Natural Resources. Accordingly, we conclude as a matter of law that the pollution exclusion contained in each policy bars coverage for damages resulting from the presence of coliform bacteria in Autumn Hills' water supply.

### b. Failure to build amenities

Williams next contends that the district court erred in concluding as a matter of law that the Insurers had no duty to defend Collier against the class' claims for negligence and breach of contract based on the allegations that Collier failed to build various promised amenities, including a picnic area, basketball court, and softball diamond, at Autumn Hills.

The district court determined that these allegations did not give rise to claims potentially within the policies' coverage, because the policies cover only "bodily injury and property damage" resulting from "occurrences." The Eighth Circuit has previously concluded that Missouri law does not consider breaches of contract to be occurrences. Secura Ins. v. Horizon Plumbing, Inc., 670 F.3d 857, 862–63 (8th Cir. 2012). Accordingly, the district court held that the Insurers had no duty to defend Collier against the breach of contract claim. It further found that the Insurers had no duty to defend the negligence claim premised on Collier's alleged failure to build

promised amenities because the factual allegations sounded in contract, not tort. See McCormack Baron Mgmt. Servs., Inc., 989 S.W.2d at 170–71 (an insurer has a duty to defend where the complaint "alleges *facts* that give rise to a claim potentially within the policy's coverage" (emphasis added)); cf. Brand v. Kansas City Gastroenterology & Hepatology, LLC, 414 S.W.3d 546, 553 (Mo. Ct. App. 2013) (concluding that there was no duty to defend where the policy did not cover intentional torts, and the original petition asserted a "negligence" claim premised on allegations of intentional conduct).

Williams does not dispute that none of the insurance policies cover damages resulting from breach of contract. However, she argues that the district court erred in finding that her negligence claim was actually a breach of contract claim. Williams points out that under Missouri law, the same set of facts may give rise to both a breach of contract claim and a negligence claim. See Schreibman v. Zanetti, 909 S.W.2d 692, 701 (Mo. Ct. App. 1995). Here, however, we agree with the district court that Williams has not alleged facts that would support a negligence claim. Rather, all Williams alleges is that Collier promised to build certain amenities, and breached that promise. Thus, the Insurers had no duty to defend Collier on Williams' breach of contract or negligence claims based on Collier's failure to build amenities.

**2. Duty to indemnify**

The district court concluded that because the Insurers had no duty to defend Collier, they likewise had no duty to indemnify Collier. Williams contends that this was an error. She points out that while the duty to defend is determined by examining the complaint, the duty to indemnify is determined by examining the facts ultimately established at trial. See McCormack Baron Mgmt. Servs., Inc, 989 S.W.2d at 173. Thus, in Williams' view, we should determine whether the Insurers

had a duty to indemnify Collier based on the factual findings of the state court in the Original Action.

Under Missouri law, if the allegations of a complaint give rise to a potential claim for coverage, but the facts ultimately proven at trial do not give rise to a claim for coverage, then an insurer will have a duty to defend, but not indemnify, the insured. See id. at 173–74 (concluding that the insurer had a duty to defend based on the allegations of the complaint, but that the court could not determine whether the insurer had a duty to indemnify until after the facts were developed). However, the reverse is not true: Missouri courts have repeatedly held that where an insurer has no duty to defend, it also has no duty to indemnify. E.g., Penn-Am. Ins. Co. v. The Bar, Inc., 201 S.W.3d 91, 98 (Mo. Ct. App. 2006); Am. States Ins. Co. v. Herman C. Kempker Const. Co., 71 S.W.3d 232, 236 (Mo. Ct. App. 2002); Superior Equip. Co. v. Maryland Cas. Co., 986 S.W.2d 477, 484 (Mo. Ct. App. 1998). Accordingly, we conclude that the district court did not err in finding as a matter of law that the Insurers had no duty to indemnify Collier for the judgment in the Original Action.

In sum, because the Insurers had no duty to defend or indemnify Collier for the claims asserted in the Original Action, the district court did not err in granting judgment on the pleadings to the Insurer.

### III. Conclusion

We affirm the judgment of the district court.

_____

-25-